**Birdie Mae DAVIS et al., Plaintiffs,**

v.

**BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY, ALABAMA, et al., Defendants.**

**Civ. A. No. 3003-63-H.**

United States District Court, S. D. Alabama, S. D.

March 28, 1975.

J. U. Blacksher, Mobile, Ala. and Jack Greenberg, NAACP Legal Defense Fund, New York City, for plaintiffs.

C. S. White-Spunner, Jr., U. S. Atty., Mobile, Ala. and Anita Marshall, Ed. Section, Civ. Rights Div., Dept. of Justice, Washington, D. C., for plaintiff-intervenor, the United States.

Abram L. Philips, and Victor T. Hudson, Mobile, Ala., for defendants.

ORDER

HAND, District Judge.

This matter came on for hearing before the Court on the petition of the School Board to construct a new school at the proposed site as shown by government's exhibit 5, renovation of the Shaw School by the construction of a new wing thereon to eliminate the use of portable classrooms now used to accommodate the excess population of that school and the reconstruction of Toulminville High School on its present location so it could properly accommodate the students assigned thereto. The proposed zones for the respective schools are shown on government's exhibit 5 and the prognostications of the School Board

as to the number of students attending and their race is as follows:

A. 1000 students presently at the new proposed site reflecting a ratio of approximately 50% Black and 50% White.

B. Approximately 1000 students at the Toulminville site reflecting a ratio of 100% Black; and

C. Approximately 1400 students at Shaw reflecting a ratio of approximately 70% White and 30% Black.

It was agreed by the School Board that the proposal submitted to the Court, based on the findings by the Bi-Racial Site Selection Committee, was the only viable alternative presented to the School Board that would serve to maximize integration, construct much needed facilities, and reduce the population at the existing schools to more workable limits. It was the expressed opinion of the school authorities that the optimum size for high schools is for a plant to accommodate 1500 students. Such a size, under the existing conditions prevailing in the Mobile community, provided optimum opportunity for success in the learning process. One of the considerations entailed in this, and certainly not the least of such, is the maintenance of discipline. The government's attorney reflected some degree of amazement at this conclusion, but no evidence was introduced to contradict the opinion or to indicate that it was based on an unsound premise.

The petition described above, the product cause of this hearing, was the result of an Order of this Court entered on July 9, 1971. This July 9, 1971 Order adopted a comprehensive plan for the establishment of a unitary system for the Mobile County Schools. That plan recognized that a problem existed insofar as the Toulminville High School was concerned.[1] This particular high school has been the subject of some controversy in this and in the Appellate Courts and has been ordered ultimately closed. The 1971 Order, recognizing this, provided, among other things, that the School Board seek professional advice and advice of the respective communities,[2] in order to bring forth for the consideration by the Court of a site for the construction of a new high school in the Shaw-Toulminville community. The Toulminville High School was to remain open only during the interim period, thus providing an opportunity for the planning and construction of the new facility.

Some background and history of the Toulminville community and its high school might be helpful at this point. Toulminville was in essence an all-White community up and into the 1950s. The school located in Toulminville that is now the present high school actually was a junior high and elementary school, both being neighborhood schools and attended by Whites. Due to a variety of reasons (including governmental urban renewal, but not including governmental or private action, the likes of which have been so heavily condemned for producing segregation), the Toulminville community began the slow transition from an all-White neighborhood to an all-Black neighborhood. When the Court decrees dismantled the dual school system, the Toulminville schools became for all intents and purposes all-Black. Toulminville represents a substantial up-grading of community life and living standards for Blacks, both as a neighborhood of which its residents can rightfully be proud and is one that engenders an enormous civic pride.

History of this case reflects that attempts have been made to draw zones encompassing the Toulminville High School so as to desegregate it. Prior to the entry of the 1971 Order, a zone was drawn that would have required approximately 200 Whites to attend. As a practical result none did. The 1971 Order did require 107 White students to attend. These disappeared in due time. (Again the Court does not know whether the

---

1. See pp. 13–14 of plan.

2. A Bi-Racial Site Selection Committee.

number assigned represents the census figure of those eligible to attend or the enrollment figure.) In any event, the evidence shows that Toulminville is now an all-Black school with approximately 1400 students in attendance. The testimony also reflects that it is the opinion of the school personnel that regardless of the action taken by the School Board, or the Court, to assign White students to Toulminville, in the event that school is maintained, Whites will not attend. Simply, those who moved from the area to avoid the consequences will not voluntarily return.

It has been pointed out to the Court by plaintiffs that the reasons advanced by the School Board as to why Whites would not attend a high school located on the present site of the Toulminville High School are fallacious, and the example advanced as to why this is felt to be true was the results obtained at Williamson High School. Williamson was initially an all-Black school located in a Black neighborhood. It is a predominately Black school now with approximately 30–35% of the students in attendance being White.[3] The argument is that if Whites can successfuly be assigned to Williamson they could likewise be to Toulminville. Therefore, any new high school to be constructed demands the rebuilding of Toulminville on its present site (which had adequate acreage) and rezoning sufficient to secure the requisite White attendance.

This is an intriguing argument, but it pretermits some realistic considerations:

1. Whites have been assigned to Williamson, but the statistical evidence filed with the Court indicates a slow attrition [4] in the direction of a return to an all-Black school.

2. The statistical population of Black to White in the Mobile County School System now stands at approximately 59% Black and 41% White. (This represents a change from 1971 of 53%

Black to 47% White.) There are only so many Whites that can be spread among the schools.

3. Transportation becomes an increasing problem due to the location of the present site of Toulminville and the availability of arterial access.

4. The historical evidence of such efforts in the Mobile area; and

5. The unwarranted effect on the stability of the other schools in the system by the constant altering of attendance zones (present stability having slowly developed a degree of normalcy in the present institutions that is allowing a return to the learning process).

This Court is well aware of the desire of the Toulminville community to retain its community school. The Court has been petitioned and deputations have presented themselves to the Court on behalf of this laudable desire. Indeed, if a school were permissibly located on the present site it would provide a community focal point that would be beneficial to the community and would permit the vast majority of the students attending the privilege of being able to walk to school if they so desired. The unfortunate aspect of this is that the Appellate Courts have said that this school be closed, for any such arrangement in all probability would result in an all-Black institution, and this Court is not permitted to consider that such an institution may be the result of normal migration of populations, unfettered by governmental interference.

It is obvious to the Court that the recommendations of the Bi-Racial Site Selection Committee, as adopted by the School Board and presented to this Court, constitute a compromise of the Court's directive that a new site for a new school, be selected. As indicated, the directive to the School Board was to select the site for the construction of a new school in the Shaw-Toulminville attendance area that would serve the needs

---

3. See reports to Court Oct. 1974.

4. Whites attending Williamson have dropped from 558 in 1971 to 414 in 1974 while Blacks have increased from 826 in 1971 to 1095 in 1974—reports to Court.

of the community and meet Constitutional Mandates providing for maximum desegregation.

Shaw is overcrowded. Toulminville was never intended as a high school, being the amalgamation of a junior high school and an elementary facility. Shaw has a present population·of approximately 1800 students and though the central core facilities were designed to accommodate a population of from 1400 to 1500, the classroom facilities were built to accommodate 1000 students. There are presently in use some thirty or more portable classrooms. The total population of both the Shaw and Toulminville schools is approximately 3200 students. (Again the Court does not know how many the census would show are eligible to attend these schools if in fact they did so.)

The proposal submitted contemplates, (1) the construction of a new school on a proposed site as reflected on government's exhibit 5. This new school would have an initial population of not more than 1000 students made up of half from the Shaw area and half from the Toulminville area. The racial make-up would be roughly 50% Black and 50% White. The results of such maneuver would leave Shaw with a population approaching 1500 students, the optimum desired. (2) A new wing, designed in the original design of Shaw but not constructed, would be completed at Shaw, thus doing away with the necessity of portable classrooms. The racial composition of this school would be 70% White and 30% Black. (3) Toulminville would be reduced in size to 1000 students and maintained at that level. New facilities would be constructed at the present site and the racial composition of the school would be initially 100% Black. The school authorities indicate in their opinion that slowly, very slowly, Whites would begin to return to the Toulminville area and attend the school in extremely limited numbers. Maybe so.

This, it is claimed, would maximize desegregation to the extent practically possible or likely to result.

Alluding for the moment to the location of Toulminville again. There are only two routes out of the Toulminville area to the proposed new site. One is to the south out U.S. Highway 98, a very congested route. The other is to the north and out and through the Blount district to Overlook Road over U.S. Highway 45, another congested arterial route. There is no other means by which Interstate 65 can be crossed in between these two routes. It would do no good to consider redrawing zones north and south east of Interstate 65 for you do not run into any substantial White neighborhoods. Most of the Whites in the Mobile area live west of Interstate 65. Therefore, whatever is done is going to require substantial transportation of large numbers of students over dangerous routes to meet the requirements initiated by Court decree.

Since this Court would not be permitted to enter a decree that would create an all-Black school, and this is so even though such all-Black school would not be the result of State, County or public school action or prior actions causing the same, the Court is unable to accept the proposed solution to the problem, admittedly a compromise, and to which plaintiffs and government-intervenors have objected. Plaintiffs and government-intervenors have represented to the Court that they would have no objection to the compromise if the problem created by the all-Black school in Toulminville could be resolved by full and complete integration thereof as they contend the law mandates.

 It is therefore ordered that so much of the plan submitted by the School Board requesting authorization to complete the facilities at Shaw school are hereby approved inasmuch as the evidence convinces this Court it would in no way affect segregation or desegregation within the Mobile School system and inasmuch as any further delay would only serve the office of increasing the costs of those buildings due to inflation. It is further ordered that except as above, the plan submitted by the School

Board is rejected. The School Board is directed to reconsider the problem and secure appropriate assistance from experts as may be required, (the University of Alabama already being involved, may be continued for consultation purposes) for the purpose of providing this Court with suggestion of a location of a new high school in a neutral zone to which students in the Shaw-Toulminville area may be assigned that would maximize desegregation. The School Board may, in its discretion, request the assistance of the Bi-Racial Site Selection Committee if that committee is not so polarized in their determinations that their assistance would no longer be of benefit.[5]

---

5. The Court feels compelled to parenthetically note that the solution to the problem suggested by the School Board and submitted by the Bi-Racial Site Selection Committee is in the opinion of the Court a viable solution for the problem at hand. To maximize desegregation on a permanent basis, more Blacks will ultimately attend school with Whites under this proposal. Were it not for the prior decisions of the Courts which preclude the establishment of an all-Black school by judicial acceptance of a proposed zoning plan, even though common sense, reasonable practicality, history, child safety, educational stability, disciplinary considerations, community pride, lack of government creation of the problem, unneeded consumption of fuels, etc., all mitigate in favor of such decision, this Court would approve the proposal submitted to it.

Any new school site selected in compliance with the above Order which this Court has entered under what it understands to be the present art of the law, will, in the opinion of the Court not result in any real resolution of the problem. True, it may initially bring about a desegregated school, but because of the peculiar nature of the distribution of the population in and around the area involved and the proven predilections of the citizens, this school will in all probability return to an all-Black status. Therefore, the results of this consideration forcibly indicate to the Court that, if the Court correctly interprets the present case law requirements, what is accomplished is the disruption of the Toulminville community school, transporting it westward, creating horrendous transportation problems and ending up with the same results.